IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| PAUL D. CALDWELL, #261005, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-CV-975-MHT |
| | ) | [WO] |
| | ) | |
| ROBERT BENTLEY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is pending before the court on a complaint filed by

Paul D. Caldwell challenging conditions of confinement and actions taken against him

during his incarceration at the Elmore Correctional Facility ["Elmore"].  The plaintiff

names Governor Robert Bentley, Commissioner Kim Thomas, Warden Leeposey Daniels,

Alfreda Hooks, a kitchen steward at Elmore, James Jones, the chief kitchen steward,

correctional officers McKee, Clemons, Jamison, Lynam and Jones, Correctional Medical

Services, now known as Corizon, Inc., and Dr. Hood as defendants in this cause of action.[1]

The plaintiff seeks a declaratory judgment, injunctive relief, monetary damages, both

compensatory and punitive, and "any and all other relief the Court deems just and

equitable."  *Complaint - Doc. No. 3* at 17-18.  The court construes this latter "catch all"

---

[1]In the interest of clarity, any reference herein to "the correctional defendants" includes Governor Robert
Bentley along with defendants Thomas, Daniels, Hooks, McKee, Clemons, Jamison, Lynam, Jones and Abner.

request for relief as one which encompasses a request for nominal damages. *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003) ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages.").

The defendants filed special reports and supporting evidentiary materials addressing the plaintiff's claims for relief. Pursuant to the orders entered in this case, the court deems it appropriate to treat each of these reports as a motion for summary judgment. *Order of March 12, 2012 - Doc. No. 39*. Thus, this case is now pending on the defendants' motions for summary judgment. Upon consideration of these motions, the evidentiary materials filed in support thereof, the sworn complaint, the plaintiff's response to the reports, including relevant affidavits and documents, the court concludes that the defendants' motions for summary judgment are due to be granted.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]
The party moving for summary judgment "always bears the initial responsibility of
informing the district court of the basis for its motion, and identifying those portions of the
[record, including pleadings, discovery materials and affidavits], which it believes
demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex
Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d
590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine
dispute of material fact for trial).  The movant may meet this burden by presenting evidence
indicating there is no dispute of material fact or by showing that the nonmoving party has
failed to present appropriate evidence in support of some element of its case on which it
bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-24.

The defendants have met their evidentiary burden and demonstrated the absence of
any genuine dispute of material fact with respect to the claims presented by the plaintiff.
Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate
evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v.
Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R.

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding
summary-judgment motions."  Fed. R. Civ. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a)
carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine
'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*.
"'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Despite these stylistic changes, the
substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable
to the current rule.

Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-94 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  Consequently, to

survive the defendants' properly supported motions for summary judgment, Caldwell is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e).  "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative . . . summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. " *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990) (*Anderson*, 477 U.S. at 242).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment . . . ."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no

probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record . . . [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists."  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are

material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se*

litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact.  *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.  The court has undertaken a thorough and exhaustive review of all the evidence contained in the record.  After such review, the court finds that Caldwell has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment.

## III.  DISCUSSION OF CLAIMS[3]

### A.  Claims for Relief - Eighth Amendment

In the complaint and amendments thereto, Caldwell alleges that during his incarceration at Elmore the facility has been overcrowded, understaffed and underfunded causing a myriad of alleged unconstitutional conditions.  The challenged conditions include the following:  (a) The physical plant of Elmore is constructed solely of Styrofoam, a few concrete blocks and paint; (b) Elmore is housing almost double the number of inmates beyond its original design capacity; (c) The facility stays in a state of disrepair and repairs are not properly  undertaken, i.e., "jerry-rigging and band-aid methods are used to make

---

[3]The court limits its review to the allegations set forth in the complaint and amendments thereto filed by Caldwell.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Sec'y, Fla. Dep't of Corrs.*, 502 F. App'x 905, 909-10 (11th Cir. 2012) (plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (district court correctly refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

repairs when problems arise."; (d) Yard space has been reduced due to security concerns; (e) Inmates are subject to excessive heat as only a few fans are available to cool the dorms; (f) Guards sometimes sleep while on duty; (g) Inmates break institutional rules "sodomizing each other, tattooing each other with Hepatitis-C infected needles, gambling, smoking both cigarettes and dope, talking on cell phones"; (h) Pigeons and other birds leave  droppings on the yard and the outer walls of the facility; (i) Odors emit from the drains at Elmore and the compost area of the nearby recycling plant; (j) Underground pipes break and leak due to shifting soil; (k) Hazardous materials are dumped in or around the compost area and Recycling Plant; (l) The number of toilets, urinals and showers are insufficient; (m) Mold and peeling paint are present in the bathrooms; (n) Water pressure is inadequate; (o) "There is no proper lock-up cell at Elmore" as officials utilize a small room with no running water or toilet to hold troublesome inmates; (p) Inmates in lock-up for altercations with other inmates gain release from the "make shift lock up cell . . . by signing an <u>illegal</u> 'Living Agreement'" indicating that they will not "again or injure each other.";[4] (q) The Barber Shop at Elmore is housed in an old guard shack with no way for barbers to clean their clippers and tools; (r) There are various issues with the kitchen including drainage problems, lack of a sufficient number of utensils, storage of chemicals with food items, lack of proper hygiene by kitchen staff and improper storage of food

---

[4]The first amendment to the complaint establishes that Caldwell spent no time in the lock-up cell.  Thus, as discussed *infra*. at 11-12, Caldwell lacks standing to challenge the conditions of the lock-up area or the manner in which inmates secure their release from such confinement.

items; (s) Dietary sandwiches are not served to inmates in a sanitary manner, meal portions have steadily declined and left over food is thrown away; (t) Inmate clothing is only laundered once a week and kitchen workers are not provided adequate soap to take daily showers; (u) The health care provider "no longer provides pain management or pain meds to chronic care inmates patients[,]" and there are deficiencies in the containment of infectious diseases; (v) No medical staff is stationed at Elmore to address emergency situations; (w) At times, Caldwell and other inmates were required to wait in inclement weather to receive their medications and, on occasion, other inmates received the wrong medication or no medication at all because the nurses cannot read very well; and (x) Delays occurred in Caldwell's receipt of medical treatment. *Complaint - Doc. No. 3* at 8-16.  In his initial amendment to the complaint, Caldwell clarifies that he did not seek relief regarding mental health treatment, sets forth specific claims with respect to the manner in which the medical/dental treatment provided to him impacted his constitutional rights, advises that he had not been subjected to the conditions within the lock-up area at Elmore, and expounds on his barber shop claims. *First Amendment to Complaint - Doc. No. 13* at 1-2.  In a subsequent amendment to the complaint, Caldwell challenges the adequacy of the law library, his access to limited legal materials, the use of bunk beds, lack of routine laundering of blankets, i.e., blankets were washed only twice from May 20, 2011 until December 13, 2011, the presence of female officers in areas of the prison where they may

view male inmates in a state of undress and the use of female officers to provide security for male inmates. *Second Amendment to Complaint - Doc. No. 19* at 1-3. The final amendment to the complaint merely added James Jones and Solomon Abner as defendants with respect to the previously raised food service and law library claims. *Third Amendment to Complaint - Doc. No. 20* at 1-2.

### B. Absolute Immunity - Correctional Defendants

To the extent Caldwell sues defendants Bentley, Thomas, Daniels, McKee, Clemons, Hooks, Jamison, Lynam, Jones and Abner in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

> A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S. Ct. 1114, 1125, 134 L. Ed. 2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities.

*Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, the correctional defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages

from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## C.  Speculative Claims

To the extent Caldwell presents claims based on a fear of conditions or actions which could at sometime occur, these claims do not warrant constitutional protection. Mere suppositious allegations that conditions ***could*** subsequently result in constitutional violations and/or that prison officials ***may*** at some time in the future act unfavorably towards an inmate fail to implicate a constitutionally protected interest. *Conner v. Sticher*, 801 F.2d 1266, 1268 (11th Cir. 1986) (plaintiff's subjective belief harm may occur provides no basis for relief); *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (jurisdiction cannot be premised upon mere speculation); *Carter v. Heard*, 593 F.2d 10 (5th Cir. 1979) (Relief is not warranted when "the injury which [plaintiff's] pleadings contemplate is fancied, not real; prospective, not actual; and imagined, not threatened."). Thus, claims based on possible future adverse action are subject to dismissal as these claims are purely speculative and without constitutional implication.

## D.  Lack of Standing - Claims Alleged on Behalf of Other Inmates

Standing is a cornerstone of American jurisprudence on which jurisdiction lies. "[A] litigant may only assert his own constitutional rights or immunities." *McGowan v.*

*Maryland*, 366 U.S. 420, 429 (1961) (citing *United States v. Raines*, 362 U.S. 17, 22

(1960)); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 218-19 (1974)

(plaintiff must assert a legally cognizable injury in fact before federal courts have

jurisdiction).

> The essence of a standing question is whether the plaintiff has alleged "such
> a personal stake in the outcome of the controversy as to assure that concrete
> adverseness which sharpens the presentation of issues upon which the court
> so largely depends for the illumination of difficult constitutional
> questions[.]" *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703 7 L.Ed.2d
> 663 (1962).

*Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987); *Harris v. McRae*, 448

U.S. 297, 320 (1981) (same).

Standing involves two aspects. The first is the minimum "case or controversy"

constitutional requirement of Article III. *Saladin*, 812 F.2d at 690. "To satisfy this

'irreducible' constitutional minimum required for standing, a litigant must show 1) that he

personally has suffered an actual or prospective injury as a result of the putatively illegal

conduct; 2) that the injury can be fairly traced to the challenged conduct; and 3) that the

injury is likely to be redressed through court action." *Saladin*, 812 F.2d at 690 (citing

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S.

464, 472 (1982)); *Warth v. Seldin*, 422 U.S. 490, 499 (1975). If any element is lacking, a

plaintiff's claim is not viable. In addition, the Supreme Court has established several

requirements based on prudential considerations. *Saladin*, 812 F.2d at 690 (internal

citations omitted) ("The Supreme Court has also stated that, in addition to these essential constitutional requirements, a court should consider the case in light of three principles which might counsel judicial constraint, referred to as 'prudential' considerations . . . . Those considerations are 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties").

The instant complaint contains several claims relative to conditions of confinement, medical/mental health treatment and adverse actions by correctional officials and medical personnel to which other inmates may have been or were subjected during their confinement at Elmore.  In accordance with applicable federal law as set forth herein, Caldwell lacks standing to assert the constitutional rights of other persons.  *Saladin*, 812 F.2d 690; *Allen v. Wright*, 468 U.S. 737, 751 (1984).  The prudential limitation applicable in this case is that a litigant may not assert the legal rights or interests of another person. With respect to the claims arising from alleged violations of other inmates' constitutional rights, Caldwell is not "asserting [his] . . . own legal rights and interests [but] rather . . . the legal rights and interests of third parties."  *Saladin*, 812 F.2d at 690.  These claims

therefore entitle Caldwell to no relief and summary judgment on such claims is due to be

granted in favor of the defendants.

### E.  Conditions Claims for Which Standing Exists[5]

The correctional defendants deny that the conditions made the basis of the instant

complaint rise to the level of constitutional violations.  Warden Daniels addresses these

claims as follows:

#### Claims in the Original Complaint

1. The Plaintiff alleges that Elmore Correctional Facility houses more
inmates than its original design capacity, which is true, but that fact alone or
in combination with other claims, is not a constitutional violation.  Additions
and improvements have been added over the years to accommodate more
inmates [than that of the original design capacity].  I absolutely deny that the
Elmore Correctional Facility houses "too many inmates" with respect to a
constitutional violation.  The Facility is not in "disrepair and/or jerry-rigged".
Just like any building, repairs are occasionally needed and are done in a
professional manner.  The building does have Styrofoam as insulation in the
walls but it is not just "covered with paint and a few concrete blocks mixed
in".  The Facility is a sound structure and does not subject the inmates
housed there to any harm or danger.  If it was as the Plaintiff alleges, the
facility could not secure and/or hold inmates, which it obviously does.  The
Plaintiff claims that "the yard size has been reduced", but does not allege
how this fact violates his constitutional rights.  Over the years the facility has
undergone security improvements since its original construction. . . .  There
is sufficient room in the yard for inmates [to] exercise.

2.  The Plaintiff alleges that inmates are required to exit their dorm during
hot periods of the year and this is true.  Inmates are required to leave the
dorms at certain times during the day so that the dorms can be cleaned [and
may be placed outside for security reasons]. . . .  [T]he temperature outside

---

[5]It is clear to the court that these claims are directed solely at the correctional defendants.

is sometimes hot, but [the inmates] are not required to stand in the sun for long periods of time. This again, is common with all ADOC facilities. When the temperature rises, inmates are given access to additional water and ice. . . .

3. Inmates are required to maintain the Departmental dress code which requires that shirts be wor[n] and tucked-in when [inmates] are outside their living quarters. This is a requirement to help maintain order and so that the inmates can be quickly identified due to their AIS Number having been stenciled on their shirts.

4. I deny that inmates are "allowed to sodomize one another, tattoo each other with infected needles, smoke dope, and talk on cell phones". This kind of activity is strictly prohibited [by institutional rules], but unfortunately, it is a fact that some inmates do these things. Security officers are constantly on the look-out for this kind of inmate activity and are diligently trying to stop this kind of activity. When [the offending inmates are caught], they face disciplinary action. Again, Inmate Caldwell is making a general and non-specific claim without any names and/or dates. . . .

5. The Plaintiff alleges that pigeons cause a health hazard at the Elmore Correctional Facility. I have never heard of pigeons causing a health hazard at ECF. Pigeons, of course, do leave their droppings occasionally on the premises, . . . but [to my knowledge] it is not significant, nor is it a health hazard. . . .

6. As Warden of the Facility, I make daily rounds through the Facility. Since my tenure here at Elmore, I have not noticed any bad odors coming from the drains, therefore I deny this allegation. The facility is cleaned on a regular basis with cleaning materials that control odors. Occasionally, I have noticed that you can smell the materials at the Compost Area of the Recycling Plant, which is not surprising. At no time have I noticed . . . these occasional odors to be overbearing or that they cause any health problems. I deny that the Compost Area and/or the Recycling Plant handle any hazardous materials and further deny that any hazardous materials are going into the ground [or the water supply]. . . .

7. I deny that the bathrooms at ECF are inadequate. We do utilize water

16

saving devices as a conservation and cost-saving measure.  Just like at every other facility within ADOC, things break both from wear and tear and from inmate destruction.  When a plumbing fixture is broken, it is repaired and/or replaced at the earliest opportunity.  Water pressure in the facility is more than adequate.  The bathrooms are cleaned on a regular basis and are painted as needed.  I deny that the bathrooms are constantly covered with mold and mildew.

8.  I would agree that ADOC, state-wide, including Elmore, has occasionally been short on correctional officers, but never to a detriment to the security of the facility.  Correctional Officers are under administrative regulations concerning the treatment of inmates and if they violate those regulations, they receive disciplinary action.

9.  I deny that Elmore doesn't have a 'lock-up area'.  ECF has no segregation cells but does have a holding area that is utilized as a temporary lock-up area.  This lock-up area is used to temporarily hold unruly inmates [so that they can be monitored more closely by correctional officers].  If an inmate needs to go to a segregation cell, he is transferred to Draper Correctional Facility or the Staton Correctional Facility, which both are in a close proximity to ECF.  Inmate[s] placed in that holding area are watched closely and are given bathroom breaks as needed, food, and sleeping materials.

10.  I deny that Elmore doesn't have a proper barber shop.  Inmates at ECF use the barber shop within the facility.  The barbering tools are sanitized [by inmate barbers utilizing appropriate sterilization materials] before use.  Correctional Officers oversee the barbering services.  To my knowledge and belief, ECF has not received any complaint and/or information from the contracted health care providers that the barbering at ECF has caused any health problems. . . .

11.  Inmates are allowed sufficient time to eat their meals at ECF.  They are not allowed to use meal time as [a] visiting and/or leisure period.  I deny the claim concerning insufficient time to eat.

12.  I deny that inmates are required to sign "illegal living agreements".  Inmates sign a living agreement stating that they can live together without confrontation.  If they cannot [and refuse to sign the living agreement], then

they are separated with one being sent to a different Facility.

13.  ECF inmates who work in the kitchen are provided with sufficient clean clothing.  ECF inmates (all) are provided with sufficient soap to shower.

**Claims in the Amended Complaint (Docket #13)**

\*\*\*

2A.  The Plaintiff alleges that ADOC denies him adequate medical care due to the fact that there is no full time doctor and/or nurse at ECF.  He does not claim that I denied him medical care.  The Health Care Unit at the Draper Correctional Facility serves, Draper, Staton, and Elmore Correctional Facilities [as these facilities are adjacent to one another].   At ECF the medical staff holds a sick call every day.  Inmates are transported to the [health care unit at Draper] on a as-needed basis. . . .

\*\*\*

**Claims in the Amended Complaint (Docket #19)**

1B.  I specifically deny that Inmate Caldwell having to wait for a legal kit is a constitutional violation.  Neither Inmate Caldwell, nor any other inmate at ECF, has complained to me that having to wait on a legal kit has, in any way, jeopardized his (their) ability to file legal documents.

2B.  I specifically deny that the law library's size/space is too small.  Neither Inmate Caldwell, nor any other inmate at ECF, has complained to me that the size of the law library has [adversely impacted] his (their) ability to file legal documents.

3B.  I specifically deny that the bunks stacked two high [i.e., the use of bunk beds,] is a constitutional violation.  I further deny that the correctional officer's view is obstructed.  I have been in an inspected every dorm in ECT specifically for the purpose of making sure officers have an unobstructed view of inmates.  I also deny that inmates assigned top bunk are unduly at risk of injury.

4B.  The cleaning of blankets is done every sixty days.  The blankets [at] ECF are not "dirty".  If a dirty blanket is observed by a Correctional Officer he/she has the authority to replace [it] with a clean blanket.  Linens are cleaned every week.

5B.  I deny that having female officers assigned to ECF is a constitutional violation.

**Claims in the Amended Complaint (Docket #20)**

1C.  I specifically deny that inmates at ECF are receiving reduced serving[s] of food.  I have observed and inspected the kitchen on numerous occasions and have observed inmates being served a normal portion of food.

\*\*\*

*Exh. B to the Correctional Defendants' Second Supplemental Special Report - Doc. No.*

*34-2 at 2-8.*

Caldwell filed a response to the correctional defendants' special reports supported by his affidavit, affidavits/sworn statements from other inmates and other documents.  In his affidavit, Caldwell argues that overcrowding and lack of a sufficient number of guards causes a consistent potential security hazard and "guards [have] almost lost control" of situations at Elmore.  *Exh. A to Plaintiff's Response - Doc. No. 44-1* at 1-2.  Caldwell also alleges that (i) the exercise yard contains a walking track around "about a 3/4 of an acre" and this area is insufficient to allow him adequate exercise because inmates "play volleyball, football, soccer, frisbee and walk and run all at the same time"; (ii) he is subjected to "brutal heat" during the summer months causing heat sickness; (iii) the

number of bathrooms is insufficient causing him to wait to use the restroom; (iv) due to a confidential code among inmates that "you must leave an empty toilet between you and the next man on the toilet when defecating[,]" he has suffered pain "trying to hold [his] bowel movements."; (v) odors emanate from the bathroom area; (vi) correctional officers' view of the dorm is at some points obstructed; (vii) blankets are not washed at appropriate intervals; (viii) the sanitation efforts employed by inmate barbers are insufficient; (ix) he is not allowed sufficient time to eat his meals, food portions are inadequate and food service is unsanitary; (x) food items are substituted for those listed on the menu; (xi) the issues with food service have resulted in his loss of muscle mass and increased body fat; (xii) the kitchen floor is sometimes wet; (xiii) the compost area and Recycling Plant emit odors; and (xiv) drains become clogged causing sewer water to flow onto the floor. *Id*. at 2-10. Caldwell acknowledges that maintenance workers are present at the facility "nearly every day making repairs and keeping general maintenance of the prison" but alleges these workers often use "jerry-rigging methods when it comes to repairs to the prison." *Id*. at 10.

Although overcrowding and under staffing exists in the Alabama prison system, these facts, standing alone, are not dispositive of the issues before this court. Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes those conditions of confinement which involve the wanton

20

and unnecessary infliction of pain.  *Id*. at 346.  Specifically, it is concerned with

"deprivations of essential food, medical care, or sanitation" or "other conditions intolerable

for prison confinement."  *Id*. at 348 (citation omitted).  Prison conditions which may be

"restrictive and even harsh, [ ] are part of the penalty that criminal offenders pay for their

offenses against society" and, therefore, do not necessarily constitute cruel and unusual

punishment within the meaning of the Eighth Amendment.  *Id*.  Conditions, however, may

not be "barbarous" nor may they contravene society's "evolving standards of decency."

*Id*. at 345-46.

> [T]he Constitution does not mandate comfortable prisons.  If prison
> conditions are merely restrictive and even harsh, they are part of the penalty
> that criminal offenders pay for their offenses against society.  Generally
> speaking, prison conditions rise to the level of an Eighth Amendment
> violation only when they involve the wanton and unnecessary infliction of
> pain.

*Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (internal citation and quotations

omitted).  Although the Constitution "does not mandate comfortable prisons . . . neither

does it permit inhumane ones."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting

*Rhodes*, 452 U.S. at 349).  Thus, it is well-settled that the conditions under which a

prisoner is confined are subject to constitutional scrutiny.  *Helling v. McKinney*, 509 U.S.

25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane

conditions of confinement; prison officials must ensure that inmates receive adequate food,

clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832  (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *Helling*, 509 U.S. at 31-32.  For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289-90 (11th Cir. 2004).    To demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry.  *Farmer*, 511 U.S. at 834.  In *Farmer*, the Court identified the objective and subjective elements necessary to establish an Eighth Amendment violation.  With respect to the requisite objective elements,  an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed].   Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d 1028-29.   As to the subjective elements,

> the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."  . . .  ***[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment***.

*Farmer*, 511 U.S. at 837-38 (emphasis added); *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have

22

perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491

(11th Cir. 1996) (same).   The conduct at issue

> must involve more than ordinary lack of due care for the prisoner's interests
> or safety. . . .   It is ***obduracy and wantonness, not inadvertence or error in
> good faith***, that characterize the conduct prohibited by the Cruel and Unusual
> Punishments Clause, whether that conduct occurs in connection with
> establishing conditions of confinement, supplying medical needs, or restoring
> official control over a tumultuous cellblock.

*Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

The living conditions within a correctional facility will constitute cruel and unusual

punishment when the conditions involve or result in "wanton and unnecessary infliction

of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting

imprisonment."   *Rhodes*, 452 U.S. at 347.   "Conditions . . . alone or in combination, may

deprive inmates of the minimal civilized measure of life's necessities.   Such conditions

could be cruel and unusual under the contemporary standard of decency. . . .   But

conditions that cannot be said to be cruel and unusual under contemporary standards are

not unconstitutional."   *Id*. at 347.   To determine whether conditions of confinement

constitute cruel and unusual punishment, the court must look to the effect the condition has

upon the inmate.   *Id*. at 366.   In a case involving conditions of confinement generally or

several different conditions, the court should consider whether the claims together amount

to conditions which fall below constitutional standards.   *Hamm v. De Kalb Cnty.*, 774 F.2d

1567 (11th Cir. 1985), *cert. denied Hamm v. De Kalb Cnty.*, 475 U.S. 1096 (1986); *see*

23

*also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991). The court's consideration of

whether the totality of a plaintiff's claims amount to conditions which fall below applicable

constitutional standards is limited by the Supreme Court's admonishment that

> *[s]ome* conditions of confinement may establish an Eighth Amendment
> violation "in combination" when each would not do so alone, but only when
> they have a mutually enforcing effect that produces the deprivation of a
> single, identifiable human need. . . .  To say that some prison conditions may
> interact in this fashion is a far cry from saying that all prison conditions are
> a seamless web for Eighth Amendment purposes. Nothing so amorphous as
> "overall conditions" can rise to the level of cruel and unusual punishment
> when no specific deprivation of a single human need exists.

*Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) (emphasis in original).

A prison official may likewise be held liable under the Eighth Amendment for acting

with "'deliberate indifference'" to an inmate's health or safety when the official knows that

the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to

take reasonable measures to abate it.  *Farmer v. Brennan*, 511 U.S. 825 (1994).

> To be deliberately indifferent, Defendants must have been
> "subjectively aware of the substantial risk of serious harm in order to have
> had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38,
> 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321,
> 2324-25, 115 L.Ed.2d 271 (1991)....  Even assuming the existence of a
> serious risk of harm and legal causation, the prison official must be aware of
> specific facts from which an inference could be drawn that a substantial risk
> of serious harm exists - and the prison official must also "draw that
> inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  "The known risk of injury must

be a strong likelihood, rather than a mere possibility before [the responsible official's]

failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted).  As the foregoing makes clear, "[m]erely negligent failure to protect an inmate . . . does not justify liability under section 1983."  *Id*.

(i) <u>General Physical Conditions</u>.  Caldwell presents conclusory allegations with respect to the structural stability of the Elmore Correctional Facility, the state of repair of the facility, the diminished size of the exercise yard, the presence of bird droppings, the emission of odors from drains and the Recycling Plaint's compost area, and peeling paint in the bathrooms.  Despite Caldwell's allegations regarding the aforementioned physical conditions present at Elmore, he does not establish that the above described conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain.  *Wilson*, 501 U.S. at 298-99; *Rhodes*, 452 U.S. at 347. Furthermore, Caldwell fails to demonstrate deliberate indifference or reckless disregard by the named defendants with respect to his health or safety with respect to these conditions. Specifically, he does not identify any particular condition of which the defendants were aware from which an inference could be drawn that a substantial risk of serious harm existed.  The record is also devoid of any evidence showing that the defendants drew the requisite inference.  Consequently, summary judgment is due to be granted in favor of the correctional defendants on the plaintiff's claims attacking general physical conditions at

Elmore. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-50.

      (ii)  <u>Heat Exposure, Laundering of Inmate Clothing and Blankets, Provision of Soap,</u> <u>Sleeping Guards, Obstructed View of Guards, Limited Number of Restroom/Shower</u> <u>Facilities, Short Meal Times, Low Water Pressure, Occasional Exposure to Elements and</u> <u>Utilization of Bunk Beds</u>. None of the aforementioned conditions of confinement present a severe or extreme condition that posed an unreasonable risk of serious damage to Caldwell's health or safety, and Caldwell has not alleged that he suffered requisite harm as a result of periodic exposure to hot weather, the weekly laundering of his clothes or linens, occasional lack of soap, limited access to restroom/shower facilities, short meal times, low water pressure, inattentive guards, obstructed views, occasional exposure to outdoor weather conditions during pill call or use of bunk beds. *See Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (holding that a prisoner must prove that the prison condition he complains of is sufficiently serious and "extreme" to violate the Eighth Amendment). Accordingly, the court concludes that these alleged conditions do not rise to the level of an Eighth Amendment violation. *Alfred v. Bryant*, 378 F. App'x 977, 980 (11th Cir. 2010) ("'Inmates cannot expect the amenities, conveniences and services of a good hotel.'" (quoting *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988)); *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004) (The Constitution does not mandate that

26

prisons be comfortable, *Rhodes*, 452 U.S. at 349, and "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment.").

(iii) <u>Breaking of Rules by Other Inmates</u>.  Initially, the court finds that correctional defendants are not liable for the actions of recalcitrant inmates who chose to act in violation of institutional rules.  To the extent this assertion can be construed to allege a claim of deliberate indifference to the plaintiff's safety arising under the Eighth Amendment, the court concludes that this claim entitles Caldwell to no relief.

In the evidentiary materials filed by the correctional defendants, they adamantly deny acting with either callous disregard or deliberate indifference to Caldwell's safety. *Exh. B to the Correctional Defendants' Supplemental Special Report - Doc. No. 34-2* at 3. Specifically, Warden Daniels asserts that he, along with the correctional staff at Elmore, strive to enforce all institutional rules to prevent violations thereof by inmates.  Caldwell presents no evidence of an objectively substantial risk of serious harm nor is there any evidence demonstrating an actual, subjective awareness by the defendants of a substantial risk of such harm to Caldwell, each of which is a required element of this Eighth Amendment claim.  Neither an assertion that the defendants should have known of potential dangers at Elmore nor the mere possibility that Caldwell could be injured by other inmates during the commission of rule violations is enough to demonstrate a genuine issue regarding deliberate indifference on the part of the correctional defendants. *Brown*, 894

27

F.2d 1537.

> Plaintiff has failed to establish that the Defendant[s] had a subjective awareness of a substantial risk of serious physical [harm] to Plaintiff; thus, Plaintiff has failed to establish a required element of this claim.  When viewing the evidence most favorably toward Plaintiff, a claim for deliberate indifference has not been established.

*Carter*, 352 F.3d at 1350 (footnote omitted).  Thus, summary judgment is due to be granted in favor of the defendants on this claim.  *Id*.

(iv)  <u>Dumping of Hazardous Materials, Ground Contamination and Mold in the Bathrooms</u>.  Caldwell alleges that "[h]azardous substances are being poured out on the ground" in the area of the Recycling Plant and asserts that "[s]oil samples should be taken" to determine whether health hazards exist at Elmore.  *Complaint - Doc. No. 3* at 10.  Caldwell further alleges that mold is a "common sight[]" in the bathrooms.  *Id*.  Other than his self-serving conclusory allegations, Caldwell presents no evidence to support these claims.  The correctional defendants "deny that the Compost Area and/or Recycling Plant handle any hazardous materials and [therefore] deny that any hazardous materials are going into the ground [or the water supply]."  *Exh. B to the Correctional Defendants' Supplemental Special Report - Doc. No. 34-2* at 4.  The defendants further deny that mold is a constant presence in the bathrooms and assert that the bathrooms are "cleaned on a regular basis."  *Id*. at 7.

Caldwell fails to meet his burden at the summary judgement stage as he does not

establish that the allegations regarding hazardous materials and mold resulted in a denial of the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 297; *Rhodes*, 452 U.S. at 347. Specifically, Caldwell's mere subjective beliefs and conclusory allegations regarding these conditions do not create a genuine dispute of material fact and, as such, "are insufficient to withstand summary judgment." *Holifield*, 115 F.3d at 1564 n.6. Hence, summary judgment is due to be granted in favor of the defendants.

(v)  Inadequate Barber Shop.  Caldwell challenges the limited size of the barber shop at Elmore and the sanitation procedures utilized by the inmate barbers.  The correctional defendants deny that the on-site barber shop is insufficient to meet the demands of inmates and assert that "[t]he barbering tools are sanitized before" use on an inmate.  *Exh. B to the Correctional Defendants' Supplemental Special Report - Doc. No. 34-2* at 5. Initially, it is clear that the size of the barber shop does not present a severe or extreme condition which poses an unreasonable risk of serious harm to Caldwell's health or safety.  *Chandler*, 379 F.3d at 1289.  It is likewise clear that the dimensions of the barber shop did not deprive Caldwell "of the minimal civilized measure of life's necessities" so as to violate the Eighth Amendment.  Therefore, the challenge to the size of the barber shop does not rise to the level of a constitutional violation.

Caldwell assets that at some time during his confinement at Elmore he "developed

29

a scalp infection/rash . . . [which] lasted briefly (appr. 2 weeks) and it cleared up on its own

. . . .   Plaintiff does <u>not</u> know if [the rash/infection was caused] from getting his hair cut."

*First Amendment to the Complaint - Doc. No 13* at 2.   A review of the undisputed medical

records establishes that Caldwell did not seek medical treatment for this alleged

rash/infection.  Caldwell concedes that he has no knowledge of the cause of the head

rash/infection and there is no evidence to support a claim that the barbering procedures

caused his rash/infection.  Moreover, the evidentiary materials submitted by the medical

defendants indicate that health care personnel were not aware of any medical issue arising

from the tools used by inmate barbers.  It is likewise clear that Caldwell's condition could

have occurred due to a number of other reasons unrelated to his receiving a hair cut.

In reference to these claims, Warden Daniels advises that inmate barbers sanitize

their barbering tools utilizing appropriate sterilization procedures and materials before use.

"Correctional Officers oversee the barbering services.  To my knowledge and belief, ECF

has not received any complaint and/or information from the contracted health care

providers that the barbering at ECF has cause any health problems."   *Exh. B to the*

*Correctional Defendants' Supplemental Special Report - Doc. No. 34-2* at 5.

Caldwell does not allege that any named defendant participated in the barbering

services provided to him.  The law is well settled

that Government officials may not be held liable for the unconstitutional
conduct of their subordinates under the theory of *respondeat superior* [or

vicarious liability]. . . .  *Robertson v. Sichel*, 127 U.S. 507, 515-16, 8 S. Ct. 1286, 3 L. Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties").  Because vicarious liability is inapplicable to . . . §1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

*Ashcroft*, 556 U.S. at 676; *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.).  "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Iqbal*, 556 U.S. at 677.  Thus, liability for haircuts provided to Caldwell could attach to the named defendants only if they "personally participated" in the challenged conduct or a "causal connection" exists between their actions and the alleged deprivation of Caldwell's constitutional rights.  *Cottone*, 326 F.3d

31

at 1360.  Caldwell, however, has presented no evidence, nor can the court countenance the existence of any evidence, which would create a genuine issue of disputed fact with respect to the claim of deliberate indifference by the correctional defendants as to the barbering procedures.  The record is devoid of evidence indicating that these defendants personally participated in or had any involvement, direct or otherwise, with haircuts provided to Caldwell.

In light of the foregoing, Warden Daniels and the other correctional defendants can be held liable for behavior of other correctional personnel only if their actions bear a causal relationship to the purported violation of Caldwell's constitutional rights.  To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendants, Caldwell must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to constitutional rights, or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's barbering staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Caldwell has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the named defendants directed the inmate barbers or correctional personnel assigned to the barber shop to act unlawfully or knew that they would act/acted unlawfully and failed to stop such action.  In addition, Caldwell has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which the defendants failed to take corrective action.  Finally, it is undisputed that the actions about which Caldwell complains did not occur pursuant to a policy enacted by the defendants.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not warranted.  *Cf. Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987).  Summary judgment is therefore due to be granted in favor of the correctional defendants on this claim.

(vi)  <u>Kitchen and Dietary Issues</u>.  Caldwell complains that "[t]he kitchen area has drainage problems" which causes "standing water many places within the kitchen. . . . Cleaning chemicals are stored in areas where food is and the odor of bleach . . . makes the eyes of inmates working in these areas burn and turn red.  Inmates handle food without washing their hands or without wearing plastic gloves.  The kitchen is surprisingly clean, but there are many health code violations that need correcting." *Complaint - Doc. No. 3* at 12-13.[6]  Caldwell also alleges that meal portions have diminished, extra food is thrown in

---

[6]Caldwell does not identify the "other" purported health code violations.

the trash, dietary sandwiches are not properly served to inmates, food items are not properly stored, there is cross-contamination of food and the kitchen lacks adequate spoons and trays to maintain efficient service. *Id*.

Defendant Hooks addresses these claims as follows:

1.  The Plaintiff alleges that at most times there are stopped-up drains and standing water in the Kitchen at the Elmore Correctional Facility (ECF). This is untrue.  The kitchen is cleaned on a regular basis.  All cleaning materials and water [either go] out the drain or [are] mopped up.  Water is not allowed to stand on the kitchen floor.

2.  The cleaning materials for the kitchen are not stored with the food.  The cleaning materials are stored separately [from the food].  Bleach is one of the cleaners used to clean the kitchen and to kill bacteria. [Occasionally there is an order of bleach because of the use of a bleach-based solution to kill bacteria and germs.]  Inmate workers utilized in the kitchen are required to was their hands and wear plastic gloves.  The kitchen at ECF is randomly inspected by the County Health Department and by the ADOC Office of Health Services Environmental Supervisor.  Any violations noted are corrected as soon as reasonably possible.  The kitchen at ECF has sufficient silverware and food trays to feed the inmate population.  The ADOC menu is set by the ADOC Dietician in accordance [with] dietary guidelines. Inmate workers are provided clean clothes to work in the kitchen.  The food in the ECF kitchen is stored properly, in coolers and otherwise.  There is no 'cross-contamination' of food.

3.  Leftover food is destroyed for sanitary and security reasons.  Dietary sandwiches are wrapped in sanitary wrapping and are not slid "across a dirty counter".  Just as stated above, the kitchen is cleaned on a regular basis, including all counters.

4.  Although security in the dining area is not my responsibility, I have observed that inmate[s] are allowed sufficient time to eat.

5.  I deny that I have in any way violated the constitutional rights of Inmate

34

Caldwell.

*Exh. D to the Correctional Defendants' Supplemental Special Report - Doc. No. 34-4* at

1-3; *Exh. E to the Correctional Defendants' Special Report - Doc. No. 5-5* at 1-2.

Defendant Jones avers that during his shift it is his responsibility to

supervise and monitor the kitchen area at ECF. One of the areas that I
monitor is the food service area where inmate kitchen workers serve the
inmates food from the serve line. One of [the] reasons for this monitoring
is to ensure that the food is being served correctly, to include the amount of
food served to each inmate. I have not instructed any of the inmate food
servers to reduce the amount of food served to inmates. I do not write the
menus, nor do I calculate the amount of food ordered. The ADOC menus are
made in advance by the Departmental Dietician. . . . I deny . . . that inmates
at ECF are receiving reduced portions of food from the serving line.

*Exh. E to the Correctional Defendants' Supplemental Special Report - Doc. No. 34-5* at 1-

2.

Despite his contentions regarding the conditions of the kitchen, Caldwell has failed

to establish that these conditions denied him the minimal civilized measure of life's

necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501

U.S. at 298-99; *Rhodes*, 452 U.S. at 347. Furthermore, Caldwell has failed to demonstrate

any deliberate indifference or reckless disregard by the named defendants with respect to

his health or safety. Specifically, Caldwell has failed to identify any particular incident or

condition occurring in the kitchen from which the defendants could infer that a substantial

risk of serious harm existed to him. Consequently, summary judgment is due to be granted

in favor of the correctional defendants on these claims. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-50.

(vii)  <u>Totality of Conditions</u>.  The court has undertaken a thorough and exhaustive review of the claims presented by Caldwell, the responses to these claims by the defendants, the probative evidentiary materials submitted by the defendants and the evidentiary materials submitted by Caldwell in response to the defendants' reports.  After such review, the court finds that the challenged conditions though uncomfortable, inconvenient, unpleasant and/or objectionable were not so extreme as to violate the Eighth Amendment. *Chandler v. Baird*, 926 F.2d at 1289 (11th Cir. 1991).  Specifically, the totality of the claims before this court do not amount to conditions which fall below applicable constitutional standards as Caldwell failed to demonstrate that the challenged conditions had "a mutually enforcing effect that produce[d] the deprivation of a single, identifiable human need." *Wilson*, 501 U.S. at 304.  "To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes." *Id*.  While the allegations made by Caldwell are somewhat troubling, the evidence regarding the conditions at Elmore fails to identify with requisite specificity the precise nature of the conditions and their impact on Caldwell's heath or safety.

In addition, even had Caldwell demonstrated "an excessive risk to [his] health or

safety," correctional officials cannot be held liable "solely because of the presence of objectively inhumane prison conditions." *Farmer*, 511 U.S. at 838. Caldwell has presented no specific facts nor produced any evidence indicating that the correctional defendants subjectively knew of a substantial risk of harm and disregarded this risk so as to establish deliberate indifference. *Id*.; *Carter*, 352 F.3d at 1349 (11th Cir. 2003).

### F. Medical Treatment

Due to the completely conclusory nature of Caldwell's original allegation of "deficiencies in both medical and mental health care" provided to inmates at Elmore, *Complaint - Doc. No. 3* at 14, the court required that Caldwell file an amendment to his complaint which "specifically describes how the defendants have denied him adequate mental health and/or medical treatment[.]" *Order of November 28, 2011 - Doc. No. 9* at 1. In response to this order, Caldwell advised that on an unidentified evening he was in pain, including pains in his chest, believed he "had a high fever" and self-diagnosed himself as "suffering from acute respiratory distress." *First Amendment to the Complaint - Doc. No. 13* at 1. Caldwell asserts he advised defendant McKee of his symptoms "and emphasized to him that I had difficulty breathing." *Id*. Caldwell contends the officer responded that he should "go to sick call in the morning." *Id*. Caldwell next asserts that on a different occasion medical personnel failed to test him for pancreatitis despite his reporting symptoms similar to those associated with this condition. *Id*. 2. Finally,

Caldwell maintains that he "had a bad tooth" which required extraction "and it took about

3 weeks to . . . get [an appointment with] the dentist to pull it." *Id.*

In response to the claim against him, defendant McKee states that he has no

knowledge of the allegation set forth by Caldwell. Specifically, McKee maintains that:

> I do not recall Inmate Caldwell ever coming to the Shift Office requesting
> medical treatment. Since I am not a trained medical person, it has always
> been my practice to direct an inmate's medical complaints to the Health Care
> Unit (HCU). It is then their decision as to how and what treatment is needed.
> Inmate Caldwell alleges that I told him to sign up for sick call the next
> morning and to go back to the dorm. I do not recall telling Inmate Caldwell
> anything about medical care because I do not recall Inmate Caldwell ever
> requesting medical attention. I specifically deny that happened because it
> would not be consistent with my normal practice at ECF or any other facility.
> It would make no sense for me to ignore, deny, or otherwise hinder an inmate
> from getting medical treatment when all I would have to do is pick up the
> phone and notify the HCU, which I have done on numerous occasions.

*Exh. A to Correctional Defendants' Second Supplemental Special Report - Doc. No. 38-*

*1* at 1-2.

Michele Sagers-Copeland, a registered nurse who serves as the Health Services

Administrator at Staton Correctional Facility, addresses these claims as follows:

> As part of my duties and responsibilities as the HSA at Staton, I also
> oversee the medical services provided to the inmates incarcerated at Elmore
> Correctional Facility ("Elmore"), which is located approximately a quarter
> of a mile from Staton. Because of the close proximity of Elmore and Staton,
> the medical staff at Staton also oversees and ensures the delivery of medical
> care to the inmates at Elmore as well.
> * * *
> A true and correct copy of [Caldwell's] medical records are . . .
> attached hereto. . . .

Upon arriving at any facility operated by the ADOC, inmates are notified of the procedures and processes for obtaining medical care and prescribed medications.  The health care units within ADOC facilities generally rely upon the same procedures for obtaining emergency and non-emergency (i.e., sick call) medical treatment, conducting chronic care clinics, medication administration, segregation sick call and the like and permitting an inmate's invocation of and participation in a grievance process.  As part of this medical staff's orientation of inmates, inmates are provided a form entitled "ACCESS TO HEALTHCARE SERVICES" which also provides a detailed explanation of the grievance process.  Signed Access to Care forms are included in [Caldwell's] medical records acknowledging [his] understanding of these processes and procedures.

As part of the orientation process, inmates are instructed that, in the event that they experience a non-emergency medical condition or complaint, they should utilize the process known as "sick call," which is initiated through the completion of a sick call request form.  An inmate making a sick call request is required to complete the top portion of the sick call request form (stating his name, the date of request, AIS number, date of birth, dorm location, the nature of the problem or request and his signature).  The inmate then submits the sick call request form [to medical personnel] by placing it in the locked box located outside the shift office.  The sick call request forms are removed from the locked box each day at approximately 12:00 p.m., brought to the Health Care Unit and marked as received [by medical personnel] at that time.

Upon reviewing the sick call request forms, the medical staff compiles a list of inmates that have submitted sick call request forms and provides the list to the Alabama Department of Corrections officer assigned to the Health Care Unit.  The Health Care Unit officer summons the patients by radio. [Inmates at Elmore on the sick call list are transported to the Health Care Unit at Staton for evaluation and treatment.]. . . .

A submitted sick call request form that is not [subsequently] completed by the medical staff indicates that an inmate failed to report when summoned to sick call.  A refusal must also be completed; signed by the sick call nurse and a witness (medical staff) and placed in the inmate['s] file.  If the medical complaints or problems identified by an inmate in a sick call request form appear to be urgent or life-threatening, the medical staff will immediately have the inmate brought to the Health Care Unit for medical treatment, and the inmate will not be required to wait until sick call begins.

39

As evident through[out] the records of [Caldwell, he has] relied upon and regularly utilized this sick call process to receive medical attention.

Inmates with chronic medical conditions at Elmore are also eligible to attend regularly scheduled evaluations called "chronic care clinics." Chronic care clinics are held on approximately a quarterly basis for inmates diagnosed with a chronic medical condition such as hypertension, diabetes, hepatitis C, and chronic obstructive pulmonary disease. Inmates are not charged any type of co-pay in order to attend a chronic care clinic. These chronic care clinics are particularly important for inmates prescribed certain types of medications or treatments that require regular monitoring, such as diabetics receiving insulin on a sliding scale. Mr. Caldwell [has not] participated in chronic care clinics conducted for the inmates at Elmore.

As set forth in the "ACCESS TO HEALTHCARE SERVICES" form, inmates at Elmore also receive prescribed medication through the process commonly referred to as "pill call." During pill call, inmates line up outside the pill call windows outside the pill call room at Elmore. When the inmate arrives at the pill call window, he provides a member of the medical staff [conducting pill call] with his identification badge which is issued by the ADOC. The member of the medical staff then retrieves the inmate's medication which is organized alphabetically and punches the medication out of a medication blister pack into a small plastic cup. The medication is provided to the inmate who is required to immediately take the medication.

As the pill call process progresses, the medical staff conducting pill call records the disbursement of medication on forms known as "Medication Administration Records" or MARs. These MARs are maintained and filed in the individual inmate['s] medical records. Once the medications are dispensed, the medical staff member records the dispensing of medication by placing his initial or initials in the space provided on the corresponding MAR. If an inmate does not report to pill call to retrieve his medication, the medical staff member will [place a notation of "A" or "a" in the MAR] indicating the inmate was "absent." If the medical staff conducting pill call discovers an inmate's medication has run out, expired or cannot otherwise be dispensed to the inmate, the medical staff at Elmore is instructed to document the unavailability of the medication and notify their supervisor or the prescribing physician immediately. The . . . medical records reflect [Caldwell's] receipt of medication through the pill call process. In the event that any inmate is not compliant with his medications, then the medical staff will confirm in writing a counseling session with the inmate in which the

medical staff informs the inmate as to the importance of appearing for pill call to receive his medication.

In addition to the pill call process, some inmates at Elmore are permitted to maintain their prescription medication on their person and administer this medication without oversight from the medical staff.  This process is known as "Keep on Person" or "KOP" medication administration which is more efficient and sometimes [a] more effective medication administration process.  Certain medications for certain conditions cannot be administered through the KOP program, such as narcotics and certain psychotropic medications.  When an inmate is enrolled in KOP medication administration, he or she is required to consent to such enrollment and is notified of the specifics of the process itself.  Inmates enrolled in the KOP program are given blister packs containing their medication.  These blister packs of medication provide explicit directions as to the order in which the medications should be taken. . . .  In short, inmates enrolled in the KOP program are personally responsible for taking their medication as prescribed.  However, these inmates enrolled in the KOP program are not required to receive medication through pill call. . . .

. . . [I]nmates at Elmore are well-aware of and utilize the grievance process to voice a complaint regarding any medical treatment sought or received during their incarceration at Elmore.  The initial orientation process . . . includes educating inmates as to the availability of the grievance process. . . .

The grievance process is initiated when an inmate submits a Medical Grievance form to me. . . .  After reviewing the Medical Grievance, I then provide a written response within approximately ten (10) days of receipt of the Inmate Grievance.  The written response to a Medical Grievance is included on the bottom portion of the same form containing an inmate's Medical Grievance.  Below the portion of the form designated for the "Response," the following notation appears:

> IF YOU WISH TO APPEAL THIS REVIEW YOU MAY REQUEST A <u>GRIEVANCE APPEAL</u> FORM FROM THE HEALTH SERVICES ADMINISTRATOR.  RETURN THE COMPLETED FORM TO THE ATTENTION OF THE HEALTH SERVICE ADMINISTRATOR. YOU MAY PLACE THE FORM IN THE SICK CALL REQUEST BOX

41

OR GIVE IT TO THE SEGREGATION SICK
CALL NURSE ON ROUNDS.

As stated in the Medical Grievance forms, the second step of the grievance process involves the submission of a formal Medical Grievance Appeal, at which time the inmate may be brought in for one-on-one communication with the medical staff, myself and/or the Director of Nursing.  A written response to a formal Medical Grievance Appeal is provided within approximately ten (10) days of receipt.  Medical Grievance and Medical Grievance Appeal forms are available from the Health Care Unit and the correctional shift commander office at Staton.  Inmates are instructed to place completed Medical Grievance and Medical Grievance Appeal forms in the sick call boxes located outside the shift office. [Members of] [t]he medical staff at Staton review[] the grievances daily, provide a written response within approximately ten (10) days at the bottom of the form and return a copy of the completed forms [to an authorized correctional officer] who distributes them to the inmates.  Inmates who have complaints about the medical care they have sought or received at Elmore are encouraged to utilize this grievance process.

. . . Mr. Caldwell . . . [has] not filed any grievance [prior to filing this case] during [his] incarceration at Elmore.

* * *

Contrary to the allegations in the Complaint, I am not aware of any instance with the medical staff at Staton provid[ing] the wrong or incorrect medication to [Caldwell].  The suggestion that Staton medical staff provided any inmate with the wrong medication because nurses "cannot even read very well" is simply false.  These nurses are licensed by the State of Alabama.  If the nurses on staff at Staton could not "read very well," they would not have passed the written examinations and course study required to obtain their licenses to practice nursing at various levels.

[Caldwell] also complains that "pain management" or pain medication is not available to the inmate population.  This is simply untrue.  Physicians along with other clinicians at Elmore have prescribed narcotic medications to patients who require such medications because of their underlying medical conditions.  The physicians to a prison population are routinely requested to provide inmates with a certain level of pain medication beyond over-the-counter medications.  In some instances, it has been abundantly clear that some inmates voicing these requests were simply undertaking unjustified drug seek[ing] activities.  In other instances, it has been determined that the

request was well-founded and inmates are provided with pain medication. However, I am unaware of any inmate being denied any necessary pain medication when it was warranted by the facts presented upon [a] physician's medical judgment.

The suggestion in the Complaint that the medical staff at Staton is not properly monitoring infection control at Elmore is simply incorrect. The medical staff at Staton relies on a variety of infection control and prevention practices which are intended to prevent widespread outbreaks of infectious diseases among the inmate populations at both Staton and Elmore. For example, the medical staff at Staton maintains an infectious control nurse who is responsible for overseeing any inmate who experiences a suspicious boil or ulcer or is otherwise diagnosed with MRSA or some other similar infectious disease. Once an inmate is diagnosed with any sort of potential skin infection, he or she is required to undergo evaluation by a physician as well as an examination by the infectious control nurse until the infection is resolved.

The medical staff routinely educates Elmore inmates of proper hygiene practices to prevent the widespread outbreak of infectious diseases. The medical staff also relies upon routine vaccinations for the inmate population as an additional means of infection control. The medical staff also completes documentation for food service workers at Elmore to ensure that no inmate with infectious diseases are permitted to serve food to other inmates.

The [Complaint] specifically mention[s] alleged violations of "[t]uberculosis detection and control procedures.["] However, I am not aware of any instance when the policies and/or procedures adopted by Corizon, Inc. relative to tuberculosis have been violated in any way. As a general matter, inmates undergo tuberculosis testing upon their initial intake into the state correctional system at Kilby. After an inmate's arrival at Elmore, the medical staff will monitor for tuberculosis in many ways. First, in the event any inmate reports symptoms which are reasonably indicative of tuberculosis, the medical staff will test the inmate for tuberculosis and will likely order a chest x-ray. In the event that the chest x-ray is indicative of a possible tuberculosis infection, then the medical staff may isolate the inmate from the general population. Even if an inmate does not report symptoms of tuberculosis, the medical staff also monitors for tuberculosis through the annual physical process. Inmates are also allowed to refuse their annual physical examinations; however, they are not allowed to refuse an annual

tuberculosis test. . . . [Mr. Caldwell has] gone through this process for evaluation. . . .

\* \* \*

In the event that any inmate at Elmore tests positive for "active" tuberculosis, he would be transported immediately to Kilby for isolation. Most importantly, I am not aware of any significant incidents or outbreaks of any infectious diseases at Elmore [during the relevant time period] or any other information which would support [Caldwell's] allegations relative to infectious diseases at Elmore.

In the event that an inmate housed at Elmore experiences any type of urgent or emergency medical condition, such an inmate would be immediately brought . . . down the road to Staton (approximately one quarter mile) for immediate evaluation.  In the event that the inmate requires some type of hospital or special care, an ambulance would be summoned to Staton for transfer of the inmate.  I am not aware of any instance when any inmate has suffered any medical emergency and not received appropriate or timely medical attention for his complaints and/or medical condition. Moreover, the suggestion in the Complaint that inmates have died as a result of any delay in emergency medical services is simply false. I cannot identify one instance when an inmate at Elmore experienced any unnecessary delay in receiving emergency medical treatment because of this process.

*Exh. 1 to the Medical Defendants' Special Report - Doc. No. 6-1* at 2-11 (citations to

medial records and paragraph numbering omitted).  Nurse Sagers-Copeland filed a

supplemental affidavit in which she addresses the assertions set forth by Caldwell in the

initial amendment to his complaint.  The relevant portion of this affidavit reads as follows:

As of this date, Mr. Caldwell has not submitted any grievances of any kind pursuant to the long-standing grievance process available to inmates at Elmore.

The medical staff was not notified of the incident alleged in Mr. Caldwell's Amended Complaint when he alleged[ly] requested medical treatment from the correctional staff at Elmore [for a respiratory issue]. While these allegations are not consistent with my experience with the correctional staff at Elmore, there is no documentation of any kind indicating

44

that Mr. Caldwell ever submitted a sick call request form following this purported incident or ever notified any member of the medical staff of his complaints [with respect to] this occasion.

On [a separate] "occasion," Mr. Caldwell alleges that he was suffering from abdominal pains, chest pains and nausea and that the medical staff never evaluated him for pancreatitis.  On January 12, 2010, Mr. Caldwell submitted a sick call request form complaining of "chest pains/dizziness/arm pain/trouble going to bathroom/other."  Mr. Caldwell attended sick call on January 12, 2010, at which time he was evaluated for complaints of chest and stomach pain.   As indicated in the nursing notes from the sick call evaluation, Mr. Caldwell was summoned back to the health care unit on January 13, 2010, at which time he reported to the medical staff that he felt "like [he] did when [he] had pancreatitis in the past . . . [but,] the symptoms are actively decreasing; I feel better today."

On January 26, 2010, Mr. Caldwell was re-evaluated by the site medical director for complaints of chest pain.   After this follow-up evaluation, the site medical director determined that Mr. Caldwell was most likely suffering from gastritis and prescribed him Zantac to alleviate his symptoms.  Indeed, if Mr. Caldwell had been suffering from pancreatitis, his complaints would not have [been] resolved in this manner.

Plaintiff further complains that he experienced a "three week" delay in having the dentist pull one of his bad teeth.  On December 7, 2009, Mr. Caldwell submitted a sick call request form indicating that he was experiencing tooth pain in one of his teeth which he believed would require pulling.  The following day, Mr. Caldwell was immediately referred to the dental staff for evaluation.  On December 8, 2009, the dental staff examined Mr. Caldwell and determined that the tooth would require extracting, and provided Mr. Caldwell with Tylenol and antibiotics and scheduled an appointment for him to have the tooth extracted.  Mr. Caldwell failed to appear for this appointment to have his tooth pulled [due to security measures undertaken at Elmore at the time of the appointment].   On December 29, 2009, Mr. Caldwell submitted another sick call request form requesting the rescheduling of his appointment to have his tooth removed and acknowledging that he had completed the antibiotic regimen prescribed for him [- a 10-day regimen completion of which was a pre-requisite to the extraction procedure].  Mr. Caldwell had his tooth extracted on the next available date which was January 21, 2010.  Therefore, the delay in dental treatment was a result of Mr. Caldwell missing [the initial] dental

appointment.

> While Mr. Caldwell complains that there is no "emergency medical care unit" at Elmore, I cannot find any documentation indicating that Mr. Caldwell ever experienced any medical emergency at Elmore.  Also, the Alabama Department of Corrections and the Staton medical staff have adopted and enacted specific practices and procedures in the event that an inmate at Elmore experiences a medial emergency.  For example, if an inmate at Elmore experiences a medical emergency, the Staton medical staff is less than a mile [from Elmore].  Moreover, if a medical emergency occurs at Elmore which requires transportation to a local hospital, the time frame within which an inmate is transported [for emergency treatment] does not differ in any meaningful respect . . . whether the inmate is housed at Staton or Elmore.  Therefore, I cannot identify any basis for any concern or complaints on the part of Mr. Caldwell regarding the availability of emergency medical services at Elmore.

> [With respect to the allegation regarding development of a scalp infection/rash], there is no indication of any kind in his medical records that he ever sought or received any medical treatment of any kind for any infection or rash.  As Mr. Caldwell admits in his Amended Complaint, the alleged scalp infection/rash "cleared up on its own."

> . . .  I am not aware of any additional medical treatment of any kind that should have been provided to Mr. Caldwell. . . .  Therefore, I have not denied and am not aware of any other member of the medical staff at Staton who denied Mr. Caldwell any necessary medical treatment or ignored any of his complaints.

*Exh. 1 to the Medical Defendants' Supplemental Special Report - Doc. No. 36-1* at 2-4

(citations to medial records and paragraph numbering omitted).  The information set forth

by Nurse Sagers-Copeland in her affidavits is supported by the records compiled

contemporaneously with the medical and dental treatment provided to Caldwell.

The correctional defendants deny Caldwell's allegation regarding a denial of

treatment for a respiratory issue and the medical defendants refute his claims challenging

the adequacy of medical treatment provided to him at Elmore.  The medical defendants

likewise maintain that the claims lodged against them are subject to dismissal because

Caldwell failed to exhaust the administrative remedy provided via the medical care

provider prior to filing this complaint as required by the Prison Litigation Reform Act, 42

U.S.C. § 1997e(a).

> When deciding whether a prisoner has exhausted his remedies, the court
> should first consider the plaintiff's and the defendants' versions of the facts,
> and if they conflict, take the plaintiff's version of the facts as true.  "If in that
> light, the defendant[s] [are] entitled to have the [unexhausted claims]
> dismissed for failure to exhaust administrative remedies, [the claims] must
> be dismissed."  *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008)
> (citing *Bryant* [*v. Rich*, 530 F.3d 1368, 1373-74 (11th Cir. 2008)]).  If the
> complaint is not subject to dismissal at this step, then the court should make
> "specific findings in order to resolve the disputed factual issues related to
> exhaustion."  *Id.* (citing *Bryant*, 530 F.3d at 1373-74, 1376).

*Myles v. Miami-Dade Cnty. Corr. and Rehab. Dep't*, 476 F. App'x 364, 366 (11th Cir.

2012).

In his affidavit, Caldwell repeats his general allegations of inadequate medical care

and lack of a healthcare unit at Elmore and further argues that the medical staff is

insufficient and poorly trained.  *Exh. A to Plaintiff's Response - Doc. No. 44-1* at 15.  He

reiterates his claim regarding the delay in the extraction of his tooth but does not dispute

his failure to exhaust the administrative remedy provided by the medical care provider.  *Id.*

(i)  Exhaustion of Administrative Remedies.  The Prison Litigation Reform Act

compels exhaustion of available administrative remedies before a prisoner can seek relief

in federal court on a § 1983 complaint.  Specifically, 42 U.S.C. § 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  "Congress has provided in § 1997(e)(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of all available administrative remedies is a precondition to litigation and a federal court cannot waive the exhaustion requirement. *Booth*, 532 U.S. at 741; *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998); *Woodford v. Ngo*, 548 U.S. 81 (2006). Moreover, "the PLRA exhaustion requirement requires ***proper exhaustion***." *Woodford*, 548 U.S. at 93 (emphasis added).

> Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings. . . .  Construing § 1997e(a) to require proper exhaustion . . . fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage.

548 U.S. at 90-91, 93.  The Court reasoned that because proper exhaustion of

48

administrative remedies is necessary an inmate cannot "satisfy the Prison Litigation Reform Act's exhaustion requirement . . . by filing an untimely or otherwise procedurally defective administrative grievance or appeal[,]" or by effectively bypassing the administrative process simply by waiting until the grievance procedure is no longer available to him.  548 U.S. at 83-84; *Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005) (inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA).  "The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." *Smith v. Terry*, 491 F. App'x 81, 83 (11th Cir. 2012) (per curiam).  Even where an inmate litigant "attempt[s] to amend or supplement his original complaint" regarding efforts at subsequent exhaustion, it does "not change the important historical fact:  his administrative remedies were unexhausted when he filed his original complaint.  Therefore, he cannot cure the exhaustion defect." *Id*.

The record in this case is undisputed that the health care provider for the Alabama Department of Corrections provides a grievance procedure for inmate complaints related to the provision of medical/dental treatment.  The evidentiary materials submitted by the medical defendants further demonstrate that Caldwell failed to file a requisite grievance

challenging actions of health care personnel presented in this case.[7]

Caldwell does not dispute his failure to exhaust the administrative remedy available to him for claims against the medical defendants prior to filing this case which is a precondition to proceeding before this court on such claims. *Ngo*, 548 U.S. at 87-94. Caldwell has presented no circumstances which justify his failure to exhaust the grievance procedure provided by the medical care provider. Under these circumstances, the court finds that the medical/dental treatment claims presented in this cause of action against the medical defendants are subject to dismissal for Caldwell's failure to exhaust an administrative remedy, *Ngo*, 548 U.S. at 87, and that dismissal with prejudice as to the exhaustion defense is appropriate. *Bryant*, 530 F.3d at 1375 n.1 (acknowledging that where administrative remedies are clearly time barred or otherwise infeasible inmate's failure to exhaust may "correctly result in a dismissal with prejudice."); *Marsh v. Jones*,

---

[7]Caldwell signed the complaint on July 12, 2011, *Complaint - Doc. No. 3* at 18, and this date constitutes the earliest date on which Caldwell could have submitted the complaint to prison officials for mailing. The law is well settled that a *pro se* inmate's complaint is deemed filed the date it is delivered to prison officials for mailing. *Houston v. Lack*, 487 U.S. 266, 271-72 (1988); *Adams v. United States*, 173 F.3d 1339, 1340-41 (11th Cir. 1999); *Garvey v. Vaughn*, 993 F.2d 776, 780 (11th Cir. 1993). "Absent evidence to the contrary in the form of prison logs or other records, [this court] must assume that [the instant complaint] was delivered to prison authorities the day [Caldwell] signed it." *Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001). Thus, for purposes of this Recommendation, the court considers July 12, 2011 as the date of filing.

      All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought. *Wilson v. Garcia*, 471 U.S. 261, 275-76, 105 S. Ct. 1938, 1946-47, 85 L. Ed. 2d 254 (1985). [The plaintiff's] claim was brought in Alabama where the governing limitations period is two years. Ala. Code § 6-2-38; *Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989) (en banc). Therefore, in order to have his claim heard, [the plaintiff is] required to bring it within two years from the date the limitations period began to run.

*McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008). In light of the foregoing, this court may consider only claims which relate to actions that occurred on or after July 11, 2009.

53 F.3d 707, 710 (5th Cir. 1995) ("Without the prospect of a dismissal with prejudice, a prisoner could evade the exhaustion requirement by filing no administrative grievance or by intentionally filing an untimely one, thereby foreclosing administrative remedies and gaining access to a federal forum without exhausting administrative remedies."); *Johnson*, 418 F.3d at 1157 (same); *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004) (footnotes omitted) (indicating inmate's "federal lawsuits . . . properly dismissed with prejudice" where previously available "administrative remedies have become unavailable after prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust.").

(ii) <u>Deliberate Indifference</u>.   Even had Caldwell exhausted his administrative remedies with respect to his medical/dental treatment claims, the court finds that Caldwell is nonetheless entitled to no relief as he has failed to establish deliberate indifference by either the correctional or medical defendants.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986).   Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical

needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995)

(citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish

"not merely the knowledge of a condition, but the knowledge of necessary treatment

coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment.").

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble*, 429 U.S. 97, 105-07, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S. Ct. 1970, 1977-79, 128 L. Ed. 2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to set forth a cognizable claim of "deliberate indifference to [a] serious

medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendants'

deliberate indifference to that need; and (3) causation between that indifference and the

plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).

When seeking relief based on deliberate indifference, an inmate is required to establish "an

objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, defendant must know of and then disregard an excessive risk to prisoner's health or safety). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105, 97 S. Ct. at 291; *Mandel*, 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice "not

> sufficient" to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033
> (mere medical malpractice does not constitute deliberate indifference).  Nor
> does a simple difference in medical opinion between the prison's medical
> staff and the inmate as to the latter's diagnosis or course of treatment support
> a claim of cruel and unusual punishment.  *See Waldrop*, 871 F.2d at 1033
> (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258

(citation and internal quotations omitted) (To show deliberate indifference to a serious

medical need, a plaintiff must demonstrate that [the] defendants' response to the need was

more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even

medical malpractice actionable under state law.").  Moreover, "as *Estelle* teaches, whether

government actors should have employed additional diagnostic techniques . . . 'is a classic

example of a matter for medical judgment' and therefore not an appropriate basis for

grounding liability under the Eighth Amendment."  *Adams*, 61 F.3d at 1545; *Garvin v.

Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a

condition should be treated does not give rise to a constitutional violation."); *Hamm v.

DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different

mode of diagnosis does not amount to deliberate indifference violative of the Constitution);

*Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not

violate the Eighth Amendment simply because their opinions concerning medical treatment

conflict with that of the inmate-patient).  Self-serving statements by a plaintiff do not create

a question of fact in the face of contradictory, contemporaneously created medical records.

*See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

1. <u>Correctional Defendants</u>.  The court finds that the claim regarding defendant McKee's alleged response to a request for treatment fails to entitle Caldwell to relief. Initially, Caldwell does not identify the date relevant to this claim.  A review of Caldwell's medical records indicates that the only time he made a somewhat similar complaint to medical personnel occurred on December 23, 2008.  On this date, Caldwell submitted a sick call request complaining of chest congestion, body aches and fever, symptoms he attributed to the flu.  *Exh. 4 to the Medical Defendants' Special Report - Doc. No. 6-3* at 21.  Caldwell failed to appear for his appointment at the health care unit the following day. *Id*.  Caldwell filed this case in July of 2011.  Consequently, any claim related to a request for treatment regarding these particular symptoms is barred by the two-year period of limitation as the limitation period on such claim expired in December of 2010.  *McNair*, 515 F.3d at 1173.  Moreover, Caldwell has failed establish deliberate indifference on the part of defendant McKee.  The conclusory allegations set forth by Caldwell do not demonstrate "an objectively serious need" nor "an objectively insufficient response to that need" as required for a finding of deliberate indifference.  *Taylor*, 221 F.3d at 1258.  In addition, the record is devoid of evidence to show that defendant McKee was aware of facts establishing a serious need or that he disregarded any known risk to Caldwell's health.  *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and

then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).

The remaining claims made against the correctional defendants challenging the constitutionality of treatment provided by medical professionals likewise entitle Caldwell to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g.*, *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006).

*Cameron v. Allen, et al.*, 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007).

To the extent Caldwell seeks relief from the correctional defendants for the treatment furnished to him by medical personnel, assuming *arguendo* the aforementioned

defendants exerted some authority over the manner in which those persons responsible for

the provision of medical treatment rendered such treatment, the law is well settled

> that Government officials may not be held liable for the unconstitutional
> conduct of their subordinates under the theory of *respondeat superior* [or
> vicarious liability]. . . . *Robertson v. Sichel*, 127 U.S. 507, 515-516, 8 S. Ct.
> 1286, 3 L. Ed. 203 (1888) ("A public officer or agent is not responsible for
> the misfeasances or position wrongs, or for the nonfeasances, or negligences,
> or omissions of duty, of the subagents or servants or other persons properly
> employed by or under him, in the discharge of his official duties").  Because
> vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead
> that each Government-official defendant, through the official's own
> individual actions, has violated the Constitution.

*Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th

Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts

of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v.

Butler Cnty.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no

respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228,

1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of

respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th

Cir. 1999) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)) (42 U.S.C.

§ 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their

subordinates under either a theory of respondeat superior or vicarious liability.).  "Absent

vicarious liability, each Government official, his or her title notwithstanding, is only liable

for his or her own misconduct."  *Iqbal*, 556 U.S. at 677.  Thus, liability for medical

treatment provided to Caldwell could attach to the correctional defendants only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Caldwell, however, has presented no evidence and the court cannot envision the existence of any evidence which would create a genuine issue of disputed fact with respect to deliberate indifference by the correctional defendants.  The record is devoid of evidence indicating that these defendants personally participated in or had any involvement, direct or otherwise, with the medical/dental treatment provided to Caldwell; rather, it is undisputed that correctional officials did not participate in the provision of treatment to Caldwell.  The evidentiary materials before the court demonstrate that medical/dental personnel made all decisions relative to the courses of treatment provided to Caldwell and that they provided treatment to Caldwell in accordance with their professional judgment upon assessment of his physical condition.

In light of the foregoing, defendants Bentley, Thomas, Daniels, McKee, Clemons, Hooks, Jamison, Lynam, Jones and Abner can be held liable for decisions of medical personnel only if their actions bear a causal relationship to the purported violation of Caldwell's constitutional rights.  To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the aforementioned defendants, Caldwell

must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendant] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Caldwell has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the correctional defendants directed medical or dental personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action. In addition, Caldwell has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which these defendants failed to take corrective action; instead, the undisputed medical/dental records indicate that Caldwell had continuous access to medical personnel and routinely received treatment for his conditions. Moreover, upon his complaint of tooth pain, Caldwell was immediately referred to dental personnel for evaluation and treatment. Finally, the undisputed records demonstrate that the challenged course of medical and dental treatment did not occur pursuant to a policy enacted by the correctional defendants.

Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified. *Cf. Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987). Summary judgment is therefore due to be granted in favor of defendants Bentley, Thomas, Daniels, McKee, Clemons, Hooks, Jamison, Lynam, Jones and Abner. Furthermore, even had Caldwell presented a proper basis for the claims lodged against these defendants, the medical records before the court indicate that health care personnel did not act with deliberate indifference to Caldwell's medical or dental needs.

2. <u>Medical Defendants</u>. The affidavits filed by the medical defendants thoroughly address the claims made by Caldwell alleging a lack of adequate medical and dental treatment. *Supra* at 37-46. A thorough review of the evidentiary materials filed in this case demonstrates that these affidavits are corroborated by the objective medical records compiled contemporaneously with treatment provided to Caldwell relative to the instant claims of deliberate indifference. These evidentiary materials refute the self-serving, conclusory allegations set forth by Caldwell.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by the medical defendants in addressing Caldwell's medical conditions and request for dental treatment did not violate his constitutional rights. The medical and dental care Caldwell received was certainly not "so grossly incompetent,

inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. The allegations presented by Caldwell fail to establish deliberate indifference by the medical defendants. *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545-46 (Whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability. In addition, an inmate's allegation that prison physicians did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'. . . to the level of deliberate indifference."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that Caldwell received treatment for his medical and dental issues and had access to health care personnel throughout his confinement at Elmore. It is likewise evident that health care personnel rendered treatment to Caldwell in accordance with their professional judgment. Moreover, Caldwell has failed to present any evidence which indicates the medical defendants knew that the manner in which they provided

treatment created a substantial risk to his health and that with this knowledge consciously disregarded such risk. The record contains no evidence, significantly probative or otherwise, showing that the medical defendants acted with deliberate indifference to Caldwell's medical or dental needs. Consequently, summary judgment is due to be granted in favor of the medical care provider and Dr. Hood.

### G. Female Correctional Officers

Caldwell argues that the assignment of female officers to areas of Elmore where they may on occasion view male inmates in various states of undress violates his right to bodily privacy. *Second Amendment to Complaint - Doc. No. 19* at 2-3; *Exh. A to Plaintiff's Response - Doc. No. 44-1* at 5 ("There has been times when female correctional officers work in dorms overseeing male inmates [when they may] have . . . full view of inmates showering and useing (sic) the restroom."). Caldwell also argues that the use of female officers at Elmore is a security hazard because "females are physically weaker in strength than men." *Doc. No.* 19 at 2-3; *Doc. No. 44* at 5. In response to these claims, the correctional defendants assert that the use of female officers at Elmore is not violative of Caldwell's constitutional rights.

It is well established that employment of female officers is in compliance with federal and state laws prohibiting discrimination on the basis of sex, as female and male correctional officers are afforded equal employment opportunities, including post

assignments, within the state prison system.  Moreover, correctional officers, regardless of sex, are assigned to areas within a prison to provide the maximum level of security.

(i) <u>The Privacy Claim</u>.  Caldwell contends that his constitutional right to bodily privacy is infringed because female correctional officers are given job assignments in areas of Elmore where they have occasion to view him naked.  Caldwell is entitled to no relief on his privacy claim as this court has previously decided this precise issue adversely to Caldwell's present position.  Specifically, the court determined that the State's policy of allowing female correctional officers unrestricted access to areas of prisons where they may, on occasion, view male inmates in various stages of undress is reasonably related to valid penological goals.  In making this determination, the court reasoned as follows:

> Prisoners retain a constitutional right of bodily privacy subject to limitations reasonably related to legitimate penological interests.  *See Fortner v. Thomas*, 983 F.2d 64 (1987); *see also Turner v. Safley*, 482 U.S. 78 (1987).  A prison regulation which impinges on prisoners' constitutional rights is valid if reasonably related to legitimate penological interests.  *Turner v. Safley*, *supra*.  In determining reasonableness, relevant factors include (1) whether there is a valid, rational connection between the regulation and a legitimate and neutral governmental interest put forward to justify it, which connection cannot be so remote as to render the regulation arbitrary or irrational; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates, which alternatives, if they exist, will require a measure of judicial deference to the corrections officials' expertise; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty, and on the allocation of limited prison resources, which impact, if substantial, will require particular deference to corrections officials; and (4) whether the regulation represents an exaggerated response to prison concerns, the existence of a ready alternative that fully

63

accommodates the prisoner's rights at de minimis costs to valid penological interests being evidence of unreasonableness. *Id*. at 2259-62.

The paramount penological goal is maintaining security of the institution, for the safety of the inmates, the staff and society. *See Whitley v. Albers*, 475 U.S. 312, 320 (1979). Because prisons contain an "ever present potential for violent confrontation and conflagration," [*Jones v. North Carolina Prisoners Labor Union, Inc.*, 433 U.S. 119, 132 (1977),] those who run prisons should be accorded wide ranging deference in the choice and execution of policies necessary to maintain order and discipline. *See Whitley v. Albers*, at 320; *Bell v. Wolfish*, 441 U.S. 520 (1979). The defendants assert that "if female correctional staff members were not allowed to work in the dormitory areas, it would cause logistical and security problems." . . . [It is well settled] that violent incidents in the shower and bathroom areas occur often in male facilities and rarely at the Julia Tutwiler Prison for Women. . . . The assignment of female officers to all areas of the [correctional facilities in which male inmates are housed] is a reasonable attempt to promote the legitimate penological objective of prison security. *See Robinson v. Boulier*, 121 F.3d 713, 1997 WL 546036 (8th Cir. 1997) (table, No. 94-2593) ("[I]nstitutional concerns for security and equal employment opportunities outweighs whatever minimal intrusion on Robinson's privacy that might result from surveillance by female officers."); *Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir. 1992) . . . , *Barnett v. Collins*, 940 F.2d 1530 (5th Cir. 1991) (table, No. 91-1038), wherein the Court held that no constitutional violation occurs when naked male inmates are viewed by female guards if the presence of female guards is necessary to maintain security at a correctional facility); *Timm v. Gunter*, 917 F.2d 1093, 1102 (8th Cir. 1990) (holding that opposite-sex surveillance of male inmates, performed on the same basis as same-sex surveillance is not 'unreasonable.' "Whatever minimal intrusions on an inmate's privacy [that] may result from such surveillance, whether the inmate is using the bathroom, showering, or sleeping in the nude, are outweighed by institutional concerns for safety and equal employment opportunities."); *Sypchala v. Rushen*, 877 F.2d 64, 1989 WL 67110 (9th Cir. 1989) (table, No. 87-2968) (holding that the presence of female guards while male prisoners are naked is incidental to the legitimate interest of maintaining prison security); *Grummet v. Rushen*, 779 F.2d 491, 496 (9th Cir. 1988) ("[t]o restrict . . . female guards from . . . occasional viewing of the inmates would necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs

and equal employment opportunities."). Thus, the use of female prison guards is reasonably related to a legitimate penological objective, and therefore, prisoners limited rights of bodily privacy must yield to that policy.

The policy of allowing female guards unrestricted access to inmates' living areas also serves other important interests. States have a compelling interest in eliminating discrimination against women. *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987). The prohibition of discrimination in employment applies fully to women guards and to the extent that it is an operational or administrative necessity, nondiscrimination is also by definition a legitimate penological objective. *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987). To deny females the right to be assigned to all areas of an institution would deny those employees equal employment opportunities. Further, to restrict the female prison guards [employed at male prisons] from positions which involve occasional viewing of [nude] inmates would necessitate substantial rearrangement of work schedules and, as noted, could compromise both internal security needs and equal employment opportunities for the female guards. *Gurmmett v. Rushen*, 79 F.2d at 496.

Thus, under the *Turner* analysis, the prison's policy of placing female guards in all areas of prisons, while it may impinge on prisoners' right to privacy, nevertheless clearly meets the reasonableness standard as it has been shown to be related to the legitimate penological interests of security and nondiscrimination. Therefore, this policy is constitutionally valid.

*Smith v. Boyd, et al.*, 2:09-CV-1055-MEF-SRW (M.D. Ala. 2013) - *Recommendation of the Magistrate Judge* (Doc. No. 103) at 11-13, adopted as opinion of the court by Order of August 6, 2012 (Doc. No. 107); *Pierce v. Mosley, et al.*, Civil Action No. 98-A-884-N (M.D. Ala. 2001) - *Recommendation of the Magistrate Judge* (Doc. No. 34) at 5-9, adopted as opinion of the court by Order of July 25, 2001 (Doc. No. 35).

Other courts addressing this issue have upheld occasional viewing of naked inmates by correctional officers of the opposite sex when the observation is conducted for a

legitimate penological purpose, including equal employment opportunities for guards and/or safety and security of the facility. *Sinclair v. Stadler*, 78 F. App'x 987, 989 (5th Cir. 2003) ("[T]he state's policy of using female officers to supervise the living areas of [plaintiff's] prison unit is reasonably related to legitimate penological objections, including flexibility in security personnel staffing and equal employment opportunity. Given the evidence presented, [plaintiff's] right to privacy, which is at best minimal, must yield to the state's legitimate interest.") (citations omitted); *Sattler v. Foster*, 37 F. App'x 311, 312 (9th Cir. 2002) ("Occasional viewing of male prisoners by female correctional officers does not violate the Fourth Amendment right to privacy or the Eighth Amendment prohibition against cruel and unusual punishment."); *Oliver v. Scott*, 276 F.3d 736, 744-46, nn.17-18 (5th Cir. 2002) ("We would have to expand the Supreme Court's fundamental implied rights jurisprudence to create a right for prisoners not to have members of the opposite sex view them naked."  Upon application of balancing test, the court determined that security concerns justified constant visual monitoring of all prison areas, including cross-sex surveillance in showers.); *Kuntz v. Wilson*, 33 F.3d 59, 1994 WL 417424 at *1 (9th Cir. 1994) ("Prisoners have only a very limited right of bodily privacy from guards of the opposite sex . . . . The assignment of female prison guards to positions requiring only infrequent and casual observation of naked male prisoners does not violate the prisoners' right to privacy."); *Thomas v. Shields*, No. 981 F.2d 1252, 1992 WL 369506 at *1 (4th Cir.

1992) (Male inmate's "right to privacy was not violated by the occasional, inadvertent encounter with female guards" who observed him in shower and on toilet.); *Letcher*, 968 F.2d at 510 ("[T]his Court [has] held that no constitutional violation occurs when naked male inmates are viewed by female guards if the presence of female guards is required to protect a legitimate government interest such as maintaining security at a correctional facility.  Given these principles, which we endorse, there is no basis for [male plaintiff's] claim of a constitutional violation due to the presence of female guards during the strip search."); *Michenfelder v. Sumner*, 860 F.2d 328, 334 (9th Cir. 1988) ("Our circuit's law respects an incarcerated prisoner's right to bodily privacy, but has found that assigned positions of female guards that require only infrequent and casual observation, or observation at a distance, and that are reasonably related to prison needs are not so degrading as to warrant court interference."); *Miles v. Bell*, 621 F. Supp. 51, 67 (D. Conn. 1985) ("The constitutional right to privacy may be restricted to the extent necessary to further the penal institution's legitimate goals or policies, including the need to maintain security."  No constitutional violation occurred where female guards only "occasionally viewed male inmates undressed or using the shower and toilet facilities.") (citations omitted).

As is clear from foregoing, Caldwell's right to bodily privacy is subject to limitations reasonably related to legitimate penological interests.  These interests include institutional security and equal employment opportunities for female officers.  The court

67

finds that assignment of female officers to all areas of an institution is a reasonable attempt to promote the legitimate penological objective of prison security. Moreover, such assignment also provides female guards employment opportunities equal to those of their male counterparts. The use of female prison guards is therefore reasonably related to a legitimate penological objective and other important State interests. Under the circumstances of this case, the court concludes that the defendants' motion for summary judgment is due to be granted on Caldwell's privacy claim.

(ii)  Security Issue. Caldwell asserts that "it is a safety hazard" to allow female guards, who are generally "physically weaker in strength than men[,]" to serve as correctional officers at Elmore. *Second Amendment to Complaint - Doc. No. 19* at 3. This assertion provides Caldwell no basis for relief. The law is well settled that it is impermissible to refuse employment to an individual on the basis of "stereotyped characterization of the sexes." *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977). Other than the stereotype of perceived physical weakness in females, Caldwell presents no evidence or facts in support of this claim. As such, the record contains nothing which indicates that (a) females are not physically capable of serving as correctional officers at Elmore, (b) their presence has undermined security at the facility, or (c) female officers are at a greater risk of potential harm than their male counterparts. Consequently, the State "may not legally refuse to hire women as guards in a male prison." *Smith v. Fairman*, 678

F.2d 52, 54 (7th Cir. 1982).  The correctional defendants are therefore entitled to summary judgment on this claim.

## H.  Access to Court

Caldwell asserts that the law library at Elmore is insufficient to meet the needs of inmates and he does not receive legal kits in a timely manner.  The court construes these allegations as asserting a denial of access to the court.  Caldwell maintains that "because of having to wait on a legal kit" necessary to the preparation of documents "to meet a deadline" he missed a religious service which resulted in "thirty (30) hours of extra duty work for the infraction [in order] to remain in the honor dorm."  *Exh. A to Plaintiff's Response - Doc. No. 44-1* at 13.

The law directs that incarcerated persons are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."  *Bounds v. Smith*, 430 U.S. 817, 825 (1977).  In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court clarified and limited the right to assistance recognized in *Bounds*.  Specifically, the Court held that "an inmate alleging a violation of *Bounds* must show actual injury" arising from the alleged inadequacies in the law library, legal assistance program or access provided by officials. *Lewis*, 518 U.S. at 349.  In identifying the particular right protected by *Bounds*, the Court explained that "*Bounds* established no . . . right [to a law library or to legal assistance].  The right that *Bounds* acknowledged was

the (already well-established) right of **access to the courts**. . . .  [P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"  *Id*. at 350-51 (emphasis in original) (citations omitted).  The Court further opined *Bounds* did not require "that the State . . . enable the prisoner to **discover grievances**, and to **litigate effectively** once in court. . . .  To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is [not something] . . . the Constitution requires."  *Id*. at 354 (emphasis in original).

The Court similarly rejected the argument that the mere claim of a systemic defect, without a showing of actual injury, presented a claim sufficient to confer standing.  *Id*. at 349.  Moreover, *Lewis* emphasized that a *Bounds* violation is related to the lack of an inmate's capability to present claims.  518 U.S. at 356.  "*Bounds*, which as we have said guarantees no particular methodology but rather the conferral of a capability -- the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.  When any inmate . . . shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates" the requisite actual injury.  *Lewis*, 518 U.S. at 356.  Finally, the Court

discerned that the injury requirement is satisfied only when an inmate has been denied "a reasonably adequate opportunity to file nonfrivolous legal claims challenging [his] convictions or conditions of confinement. . . . ***[I]t is that capability, rather than the capability of turning pages in a law library, that is the touchstone***." *Id*. at 356-57 (emphasis added). "[T]he Constitution does not require that prisoners . . . be able to conduct generalized research, but only that they be able to present their grievances to the courts - a more limited capability that can be produced by a much more limited degree of legal assistance." *Id*. at 360. The Court admonished that federal courts should allow prison officials to determine the best method of ensuring that inmates are provided a reasonably adequate opportunity to present their nonfrivolous claims of constitutional violations to the courts. *Id*. at 356. A federal district court must "'scrupulously respect[] the limits on [its] role,' by 'not . . . thrust[ing] itself into prison administration' and instead permitting '[p]rison administrators [to] exercis[e] wide discretion within the bounds of constitutional requirements.'" *Id*. at 363 (quoting *Bounds*, 430 U.S. at 832-33).

Caldwell presents only a conclusory allegation of a constitutional violation and fails to allege any shortcomings with respect to the legal access provided to him during his confinement at Elmore which actually hindered his efforts to pursue claims before this or any other court. It is undisputed that correctional officials allowed Caldwell access to the law library and in no way inhibited his preparation of legal documents, filing of pleadings

or processing of any cause of action. Throughout the proceedings in this case, Caldwell demonstrates he is both proficient and prolific at presenting and arguing the claims of his choice to the court of his choosing. Nothing in the record indicates that the challenged lack of access to materials or assistance improperly impeded or adversely affected Caldwell's efforts to pursue nonfrivolous legal claims. Caldwell has utterly and completely failed to come forward with any evidence that the actions about which he complains deprived him of the ***capability*** of pursuing claims in this or any other court. Hence, Caldwell does not establish he suffered the requisite injury, *Lewis*, 518 U.S. at 356, and the correctional defendants are therefore entitled to summary judgment on the legal access claim. *Barbour v. Haley*, 471 F.3d 1222, 1225 (11th Cir. 2006) (access to courts claim fails because plaintiff did not show he had been denied the capability to pursue nonfrivolous legal claims); *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991) (An inmate is entitled to no relief on an access to courts claim in "the absence of any indications of ultimate prejudice or disadvantage" regarding the capability of pursuing legal relief.).

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motions for summary judgment filed by the defendants be GRANTED.

2. Judgment be GRANTED in favor of the defendants.

3. This case be DISMISSED with prejudice.

4.  Costs be taxed against the plaintiff.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **February 25, 2015**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 11th day of February, 2015.

> /s/ Wallace Capel, Jr.
> WALLACE CAPEL, JR.
> UNITED STATES MAGISTRATE JUDGE